# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| *Plaintiff,* | |
| v. | Case No. CR-24-080-RAW |
| **JASON DALE COLE & CRYSTAL FAYE CHESSER,** | |
| *Defendants.* | |

## UNITED STATES' RESPONSE TO DEFENDANT'S MOTION TO DISMISS

Respectfully submitted,

CHRISTOPHER J. WILSON
United States Attorney

s/    Michael E. Robinson
MICHAEL ROBINSON, MA BA# 693574
Assistant United States Attorney
United States Attorney's Office
520 Denison Avenue
Muskogee, OK 74401
(918) 684-5100
Michael.Robinson3@usdoj.gov

1

**Table of Contents**

Table of Authorities……………………………………………………… 3

Statement of Facts………………………………………………………… 4

Response to Defendant Propositions of Error                              5

    I.      Count 9 of the Indictment                                5

    *II.*     *Bruen*                                          6

    III.    Multiplicity                                        18

Conclusion…………………………………………………………………….20

Certificate of Service……………………………………………………….21

## **Table of Authorities**

*District of Columbia v. Heller*, 554 U.S. 570, 635 (2008) — 6

*New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111, 2122 (2022) — 6

*United States v. Salerno*, 481 U.S. 739, 745 (1987) — 7

*Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2008) — 7

*Vincent v. Garland* 80 F.4th 1197 (10th Cir. 2023) — 8

*United States v. McCane*, 573 F.3d 1037 (10th Cir. 2009) — 8

*Rahimi. Vincent v. Garland*, 144 S. Ct. 2708, 2708-09 (2024) — 8

*Vincent v. Bondi*, 127 F.4th 1263, 1266 (10th Cir. 2025) — 9

*Medina v. Whitaker*, 913 F.3d 152, 160 (D.C. Cir. 2019) — 10

*Robertson v. Baldwin*, 165 U.S. 275, 281 (1897) — 10

*Range v. Attorney Gen.*, 53 F.4th 262, 275 (3d Cir. 2022) — 10

*Hamilton v. Pallozzi*, 848 F.3d 614, 626 (4th Cir. 2017) — 11

*United States v. Bena,* 664 F.3d 1180 (8th Cir. 2011) — 15

*Baze v. Rees*, 553 U.S. 35 (2008) — 16

*United States v. Frierson*, 698 F.3d 1267 (10th Cir. 2012) — 18

*United States v. Etenyi*, 720 Fed.Appx. 445 (10th Cir. 2017) — 18

*Blockburger v. United States*, 294 U.S. 299 (1932) — 19

*United States v. Mier-Garces*, 967 F.3d 1003 (10th Cir. 2020) — 19

*United States v. Johnson*, 130 F.3d 1420 (10th Cir. 1997) — 19

*United States v. Martin*, 2020 U.S. Dist. LEXIS 222833 — 20

*United States v. Redbird*, No. CR-19-0347-F at 5 (W.D.Okla. May 22, 2020) — 20

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　*Plaintiff,*<br><br>v.<br><br>JASON DALE COLE &<br>CRYSTAL FAYE CHESSER,<br><br>　　　　　*Defendants.* | Case No. CR-24-080-RAW |

### UNITED STATES' RESPONSE TO DEFENDANT'S MOTION TO DISMISS

COMES NOW the United States of America by and through United States Attorney Christopher J. Wilson and Assistant United States Attorney Michael E. Robinson and, hereby requests that the Court deny Defendant's Motion to Dismiss and/or Strike Portions of Certain Counts of Indictment [Doc. No. 104, hereinafter "Defense Motion"].

### I. FACTS

On May 15, 2024, the Grand Jury returned a ten-count Indictment against Defendant Cole charging him with Possession with Intent to Distribute Methamphetamine (Counts 1 and 5), Possession of a Machine Gun (Count 2), Felon in Possession of a Firearm (Counts 3 and 8), Use and Carry of a Firearm During and in Relation to a Drug Trafficking Crime (Counts 4 and 9), Possession with Intent to Distribute Marijuana (Count 6), Possession of an Unregistered Firearm (Count 8), and Maintaining a Drug Involved Premises (Count 10). The charges stem from the seizure of approximately a half pound of methamphetamine, a machine gun, extended round magazine, and various rounds of ammunition in his truck after eluding Trooper Ethan Mulkey of the Oklahoma Highway Patrol on November 18, 2023. The seizure of the contraband from Defendant Cole's truck supported a search warrant for Defendant Cole's premises, located at

20725 Gilmer Road, Okmulgee, Oklahoma, which resulted in the seizure of over three kilograms of methamphetamine, multiple firearms, firearm suppressors, and drug paraphernalia. The majority of the contraband was seized from an outbuilding on the premises, adjacent to Defendant Cole's residence.

## II. RESPONSE TO DEFENDANT PROPOSITIONS OF ERROR

### a. Defendant is Entitled to Some Relief Regarding Count 9 of the Indictment

Amongst other things, 18 U.S.C § 924(c)(1)(A)(i) criminalizes the use of a firearm in relation to a drug trafficking crime. Certain firearms, like machineguns or firearms with silencers equipped, are further criminalized by a different section in the statute. 18 U.S.C. § 924(c)(1)(B)(ii). Here, Count 9 of the Indictment charges the defendant with the possession of a firearm and silencer, but does not allege the firearm is equipped with the silencer. Defendant's Motion to dismiss Count 9 of the Indictment alleges a failure in the pleading because of that fact, that is, the Indictment does not allege the firearm identified was equipped with the silencer identified. Defendant's Motion admits a sufficient pleading in Count 9 of § 924(c)(1)(A)(i).

Outside of the statute, Defendant cites no authority for his position. Indeed, little authority interpreting that exact proposition exists. Despite the lack of authority, Defendant's Motion is well received. The United States agrees the appropriate remedy is to dismiss the portion of Count 9 that relates 18 U.S.C. § 924(c)(1)(B)(ii) and proceed to trial on the portion of Count 9 that remains under § 924(c)(1)(A)(i).

Lastly, the trial date in this matter is currently set for August 5, 2025. The United States advises it will re-present the matter to the Grand Jury and seek a superseding indictment properly alleging that the firearm was equipped with the silencer under § 924(c)(1)(B)(ii).

### b. 18 U.S.C. § 922(g)(1) Survives Constitutional Scrutiny

The Second Amendment provides that "[a] well-regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008), the Supreme Court held that the Second Amendment protects the right of "law-abiding, responsible citizens" to keep firearms in their homes for self-defense. *Heller* clarified that, "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Id.* at 626. And it said that "nothing in [its] opinion should be taken to cast doubt" on certain "presumptively lawful regulatory measures," such as "longstanding prohibitions on the possession of firearms by felons." *Id.* at 626-27 & n.26.

In *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111, 2122 (2022), the Supreme Court held that the Second Amendment protects the right of "ordinary, law-abiding citizens" to "carry a handgun for self-defense outside the home." *Bruen* struck down a New York law that required residents to demonstrate a "proper cause" to obtain a license to carry a handgun outside the home because that law "prevent[ed] law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms." *Id.* at 2122, 2156. In reaching this conclusion, the Court laid out the analytical framework for determining whether a firearm regulation is constitutional under the Second Amendment. Specifically, courts are required to "assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Id*. at 2131.

To properly conduct this task, a court must engage in a two-prong analysis. First, the court must determine whether "the Second Amendment's plain text covers an individual's conduct." *Id*. at 2126. If it does not, the analysis ends and the government's regulation is valid. If the conduct at issue is covered by the Amendment's text, however, "the Constitution presumptively protects that conduct," and the government must "justify its regulation by demonstrating that it is consistent

6

with this Nation's historical tradition of firearm regulation." *Id*. at 2129-30. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's protections. *Id.* at 2130. In conducting this historical analysis, the Court recognized that the government need not present a one-to-one comparison between regulations in existence during colonial times and those at issue in the present litigation. *Id.* at 2132. Rather, the government may demonstrate a historical tradition by identifying historical laws that are "relevantly similar" to the current regulation; thus, the United States only has to provide evidence of a "representative historical *analogue*, not a historical *twin*." *Id*. at 2132-33 (emphasis in original).

The defendant argues that Section 922(g)(1) is facially unconstitutional. But a facial constitutional challenge to a statute requires a strong showing that the defendant cannot make. A party asserting a facial constitutional challenge "must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). In other words, the defendant must show that § 922(g)(1) "is unconstitutional in all of its applications." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2008). "The fact that [§ 922(g)(1)] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid, since [the Supreme Court has] not recognized an 'overbreadth' doctrine outside the limited context of the First Amendment." *Salerno*, 481 U.S. at 745.

Here, for the reasons explained below, the defendant cannot show that § 922(g)(1) violates the Second Amendment in all of its applications, that is, that the "right . . . to keep and bear Arms," within the meaning of the Second Amendment, prevents the government from prohibiting firearm possession by any felon in any situation.

1. **The Tenth Circuit has rejected Bruen arguments**

In *Vincent v. Garland*, the Tenth Circuit held that *McCane*'s ban on firearms for convicted felons is constitutional. *See* 80 F.4th 1197, 1202 (10th Cir. 2023) (citing *United States v. McCane*, 573 F.3d 1037 (10th Cir. 2009)). The court concluded that "*Bruen* did not indisputably and pellucidly abrogate [the court's] precedential opinion in *McCane*." *Id.* Additionally, the court found that consistent with its precedent in *McCane*, the court has "no basis to draw constitutional distinctions based on the type of felony involved." *Id.*

The Supreme Court decided *Rahimi* after *Bruen*. The Court "conclude[d] only this: An individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment." *United States* v. *Rahimi*, 602 U.S. 680, 702 (2024). The *Rahimi* decision did not examine § 922(g)(1), except to state that "prohibitions, like those on the possession of firearms by felons and the mentally ill, are presumptively lawful." *Id.* at 699 (internal quotations omitted).

The Supreme Court granted certiorari for *Vincent v. Garland*, 80 F.4th 1197 (10th Cir. 2023) and remanded the case to the United States Court of Appeals for the Tenth Circuit for further consideration in light of *Rahimi*. *Vincent v. Garland*, 144 S. Ct. 2708, 2708-09 (2024).

The Tenth Circuit later held that "*McCane* remains binding." *Vincent v. Bondi*, 127 F.4th 1263, 1266 (10th Cir. 2025). This Court should adopt the majority position here, Tenth Circuit precedent should stand and continue to be followed, and the Court should find that § 922(g)(1) is constitutional under the Second Amendment.

2. **The text of the Second Amendment does not prohibit the disarming of convicted felons.**

Felon disarmament laws are consistent with the Second Amendment's text, as historically understood. Felons do not fall within "the people" protected by the Second Amendment, and "the

right . . . to keep and bear Arms" is not "infringed" by longstanding laws prohibiting felons from possessing firearms due to their convictions.

Legislatures have historically had wide latitude to exclude felons from the political community. As Thomas Cooley explained in his "massively popular 1868 Treatise on Constitutional Limitations," *Heller*, 554 U.S. at 616, "the *people* in whom is vested the sovereignty of the State . . . cannot include the whole population," and "[c]ertain classes have been almost universally excluded"—including "the idiot, the lunatic, and the felon, on obvious grounds[.]" Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 28-29 (1st ed. 1868). Felons could therefore historically be excluded from "exercis[ing] the elective franchise," *id.* at 29, as well as from other, closely related "political rights"—including the rights to "hold public office," to "serve on juries," and, most relevant here, "the right to bear arms[.]" Akhil Reed Amar, *The Bill of Rights* 48 (1998). Indeed, today it remains the case that "[t]he commission of a felony often results in the lifelong forfeiture of a number of rights" tied to membership in the political community, including "the right to serve on a jury and the fundamental right to vote." *Medina v. Whitaker*, 913 F.3d 152, 160 (D.C. Cir. 2019).

Regardless of whether felons fall within "the people," the "right . . . to keep and bear arms" has never been understood to prevent the disarming of felons. *Heller* explained that "the Second Amendment was not intended to lay down a 'novel principl[e]' but rather codified a right 'inherited from our English ancestors[.]'" *Heller*, 554 U.S. at 599 (quoting *Robertson v. Baldwin*, 165 U.S. 275, 281 (1897)). The 1689 English Bill of Rights, which "has long been understood to be the predecessor to our Second Amendment[,]" provided that "the Subjects which are Protestants, may have Arms for their Defense suitable to their Conditions, and as allowed by Law." *Id.* at 593 (quoting 1 W. & M., ch. 2, § 7, in 3 Eng. Stat. at Large 441). The wording of that provision

9

indicates that "the legislature—Parliament—had the power and discretion to determine who was sufficiently loyal and law-abiding to exercise the right to bear arms." *Range v. Attorney Gen.*, 53 F.4th 262, 275 (3d Cir. 2022) (per curiam). Thus, when the "Second Amendment . . . codified [the] *pre-existing* right" to bear arms, it codified a right that was "not unlimited," and was not understood to extend to lawbreakers. *Heller*, 554 U.S. at 592, 626.

The Supreme Court's authoritative interpretation of the Second Amendment's text confirms this view. *Heller* explained, "[l]ike most rights, the right secured by the Second Amendment is not unlimited" and is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626. *Heller* indicated that "prohibitions on carrying concealed weapons" were lawful. *Id*. It said the Amendment applies only to "the sorts of weapons" that were "in common use at the time." *Id.* at 627 (quotations omitted). And the Court said that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626-27. Thus, in conducting its "textual analysis" of the Second Amendment, *Heller* saw no inconsistency between the Amendment's text and laws prohibiting "possession of firearms by felons," *id.* at 578, 626.

Moreover, *Heller* defined the right to bear arms as belonging to law-abiding, responsible citizens, a category which clearly excludes felons. *Heller*, 554 U.S. at 635; *see also Hamilton v. Pallozzi*, 848 F.3d 614, 626 (4th Cir. 2017). *Bruen* echoed that definition, stating no fewer than fourteen times that the Second Amendment protects the rights of "law-abiding" citizens. *Bruen*, 142 S. Ct. at 2122, 2125, 2131, 2133, 2134, 2138, 2150, 2156. And six justices took pains to emphasize that *Bruen* did nothing to upset *Heller*'s and *McDonald*'s reassurances that certain firearms regulations, such as prohibitions on the possession of firearms by felons, are

10

constitutional. *See id.* at 2157 (Alito, J., concurring) ("Nor have we disturbed anything that we said in *Heller* or *McDonald* . . . , about restrictions that may be imposed on the possession or carrying of guns."); *id.* at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring) ("Properly interpreted, the Second Amendment allows a 'variety' of gun regulations," including the "'longstanding prohibitions on the possession of firearms by felons'" discussed in *Heller* and *McDonald* (quoting *Heller*, 554 U.S. at 626, 636)); *id.* at 2189 (Breyer, J., joined by Sotomayor and Kagan, JJ., dissenting) ("I understand the Court's opinion today to cast no doubt on that aspect of *Heller*'s holding" permitting felons to be prohibited from possessing firearms).

Thus, the Second Amendment's text—and the Supreme Court's decisions interpreting that text—demonstrate that the Amendment does not prohibit the disarming of convicted felons.

### 3. There is a historical tradition for § 922(g)(1)'s prohibitions

Even if the defendant's conduct was covered by the plain text of the Second Amendment, his challenge still fails because there is historical support for prohibiting such behavior.

There is a historical tradition of disarming or otherwise punishing those who committed serious felonies, whether the felonies were violent or not. Beginning in England and lasting at least through the founding era, history is replete with "representative historical analogue[s]" for § 922(g)(1) that shed light on the scope of the Second Amendment and the power of legislatures. *Bruen*, 142 S. Ct. at 2133-34 (emphasis omitted). Two types of historical laws are particularly pertinent: (1) historical laws categorically disqualifying groups from possessing firearms based on a judgment that the group could not be trusted to follow the law; and (2) laws authorizing capital punishment and estate forfeiture for certain violent and nonviolent felonies the legislature deemed serious.

First, by the time of the Second Amendment's ratification in 1791, there was an established tradition of legislatures exercising broad authority to categorically disqualify people from

possessing firearms based on a judgment that certain individuals could not be trusted to adhere to the rule of law. Because the Second Amendment "'codified a right inherited from our English ancestors[,]'" English legal tradition sheds light on the scope of the "'right secured by the Second Amendment'"—which, as with the English right, "'is not unlimited.'" *Bruen*, 142 S. Ct. at 2127, 2128 (quoting *Heller*, 554 U.S. at 599, 626).

Among the limits well established in England was the authority to disarm classes of people who, in the legislature's view, could not be depended upon to obey the rule of law. *See, e.g.*, 1 W. & M., Sess. 1, c.15, in 6 *The Statutes of the Realm* 71-73 (1688) (codifying an "Act for the better securing [of] the Government by disarming Papists and reputed Papists," which provided that any Catholic who refused to make a declaration renouncing his or her faith could not "have or keep in his House or elsewhere" any "Arms[,] Weapons[,] Gunpowder[,] or Ammunition (other than such necessary Weapons as shall be allowed to him by Order of the Justices of the Peace . . . for the defence of his House or person")). This example is particularly relevant because the same Parliament "wr[ote] the 'predecessor to our Second Amendment' into the 1689 English Bill of Rights," which similarly drew a religion-based distinction, among other limitations. *Bruen*, 142 S. Ct. at 2141 (quoting *Heller*, 554 U.S. at 593); *see* 1 W. & M., Sess. 2, c. 2, in 6 *The Statutes of the Realm* 143 (1688) (specifying that that "Protestants may have Arms for their Defence suitable to their Conditions and as allowed by Law").

The American colonies inherited the English tradition of broad legislative authority to disarm classes of people who were viewed as not dependable adherents to the rule of law. Massachusetts, for example, disarmed the supporters of preacher Anne Hutchinson in the 1630s, not because of a demonstrated propensity for violence, but because of their lack of fealty to the rule of law. *See Range*, 53 F.4th at 266 (collecting historical scholarship), *vacated upon granting of rehearing en banc*, 56 F.4th 992 (3d Cir. 2023). In another example, during the French and

Indian War, Virginia imported the English tradition of disarming Catholics who refused to take a loyalty oath. *See* 7 *The Statutes at Large; Being A Collection of All the Laws of Virginia* 35-39 (1820) (1756 Va. law).

Over the course of the Revolutionary War, American legislatures passed numerous laws "disarming non-violent individuals because their actions evinced an unwillingness to comply with the legal norms of the nascent social compact"—often specifically targeting those who failed to demonstrate loyalty to the emergent American government. *Range*, 53 F.4th at 277; *see also Range v. Attorney General*, 69 F.4th 96, 111 (3d Cir. 2023) (Ambro, J., concurring). An early example is a 1775 Connecticut law providing that any person convicted of "libel[ing] or defam[ing]" any acts or resolves of the Continental Congress or the Connecticut General Assembly "made for the defence or security of the rights and privileges" of the colonies "shall be disarmed and not allowed to have or keep any arms." *The Public Records of the Colony of Connecticut From May, 1775 to June, 1776*, at 1993 (1890) (1775 Conn. law).

In 1776, the Continental Congress recommended that the colonial governments disarm those who were "notoriously disaffected to the cause of America" or who simply "have not associated" with the colonial governments in the war effort. 4 *Journals of the Continental Congress 1774-1789*, at 205 (1906) (resolution of March 14, 1776). At least six of the governments enacted legislation in this vein, requiring oaths of loyalty to the government and to strip anyone who failed or refused to take the oath of the right to bear arms. *See* 5 *The Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay* 479-84 (1886) (1776 Mass. law); 7 *Records of the Colony of Rhode Island and Providence Plantations in New England* 567 (1862) (1776 R.I. law); 1 *The Public Acts of the General Assembly of North Carolina* 231 (1804) (1777 N.C. law); *Acts of the General Assembly of the State of New-Jersey at a Session Begun on the 27th Day of August, 1776*, at 90 (1777) (1777 N.J. law); 9 *The Statutes at Large of Pennsylvania from 1682 to*

13

*1801*, at 112-13 (1903) (1777 Pa. law); 9 *The Statutes at Large; Being A Collection of All the Laws of Virginia* 282 (1821) (1777 Va. law). Many of these laws provided that failing or refusing to take the oath resulted in forfeiture of a bundle of additional political rights, including the rights to vote, to serve on juries, and to hold public office—further reinforcing the longstanding connection between arms-bearing and these related rights. *See, e.g.*, 1776 Mass. law at 481; 1777 N.C. law at 231; 1777 Pa. law at 112-13; 1777 Va. law at 282.[1]

The Constitution's ratification debates support this understanding of the Amendment's text. Indeed, the historical background of the Second Amendment's adoption provides particularly persuasive evidence that the founders understood that the constitutional right to bear arms is compatible with broad legislative authority to disarm groups legislatures did not trust to follow the law. In *United States v. Bena*, the Eighth Circuit reviewed ratification-era proposals in Massachusetts and Pennsylvania. *See* 664 F.3d 1180, 1183-84 (8th Cir. 2011). The Pennsylvania proposal, which *Heller* called "highly influential" and referred to as a "Second Amendment precursor[,]" 554 U.S. at 604, provided for an amendment guaranteeing the right to bear arms "*unless for crimes committed, or real danger of public injury*." *Bena*, 664 F.3d at 1184 (quoting 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 662, 665 (1971)). And in New Hampshire, the convention recommended an amendment providing that "Congress shall never disarm any Citizen unless such as are or have been in *Actual Rebellion*." *Id.* at 758, 761 (emphasis

---

[1] The Pennsylvania law is particularly informative because the year before enacting it, Pennsylvania became one of the first states to adopt a state constitutional provision protecting an individual right to bear arms. *Heller*, 554 U.S. at 601; *see* Pa. Declaration of Rights of 1776 § XIII, in The Complete Bill of Rights: The Drafts, Debates, Sources, And Origins 278 (Neil Cogan ed., Oxford University Press 2d ed., 2014); *see also* N.C. Declaration of Rights of 1776 § XVII, in The Complete Bill of Rights, *supra*, at 277-78 (individual rights-based constitutional provision adopted the year before the North Carolina disarmament law cited above); Mass. Const. of 1780, pt. I, art. XVII, in The Complete Bill of Rights, *supra*, at 277 (individual rights-based constitutional provision adopted four years after the Massachusetts disarmament law cited above)

added). These proposals recognize the prevailing historical tradition of broad legislative power to disarm people who fell outside the trustworthy, law-abiding citizenry—so the proposals cannot be "shoehorn[ed] . . . into the silo of dangerousness." *Folajtar v. Attorney Gen.*, 980 F.3d 897, 908-09 (3d Cir. 2020), *abrogated in part by Bruen*, 142 S. Ct. 2111, *as recognized in Range*, 69 F.4th at 100.2

In addition, with respect to punishment for felony offenses, for centuries, felonies have been "the most serious category of crime." *Medina*, 913 F.3d at 158. In 1769, Blackstone defined a felony as "an offence which occasions a total forfeiture of either lands, or goods, or both, at the common law; and to which capital or other punishment may be superadded, according to the degree of guilt." 4 William Blackstone, *Commentaries on the Laws of England* 95 (1769). Blackstone observed that "[t]he idea of felony is indeed so generally connected with that of capital punishment, that we find it hard to separate them." *Id.* at 98.

Second, capital punishment and forfeiture of estate were also commonly authorized punishments in the American colonies (and then the states) up to the time of the founding. *Folajtar*, 980 F.3d at 904-05. Capital punishment for felonies was "ubiquit[ous]" in the late eighteenth century and was "'the standard penalty for all serious crimes.'" *See Baze v. Rees*, 553 U.S. 35, 94 (2008) (Thomas, J., joined by Scalia, J., concurring) (quoting Stuart Banner, *The Death Penalty:*

---

2 The Second Amendment as adopted does not include the same language as these proposals. But it would have been "obvious" to the founders that certain groups, including (but not necessarily limited to) "the felon," Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 29 (1sted. 1868), could properly be subject to disarmament laws consistent with the "pre-existing right" that was "codified" in the Second Amendment, *Bruen*, 142 S. Ct. at 2127 (quoting *Heller*, 554 U.S. at 592). *See also* Akhil Reed Amar, *The Bill of Rights* 48 (1998); Stephen P. Halbrook, *The Founders' Second Amendment: Origins of the Right to Bear Arms* 273 (2008) (explaining that founding-era proponents of a constitutional right to bear arms "did not object to the lack of an explicit exclusion of criminals from the individual right to keep and bear arms" during the debates over "what became the Second Amendment," because this limitation "was understood").

*An American History* 23 (2002)).

Indeed, the First Congress (which drafted and proposed the Second Amendment) made a variety of felonies punishable by death, including not only offenses like treason, murder on federal land, and piracy on the high seas, but also non-violent conduct relating to forging or counterfeiting a public security. *See* An Act for the Punishment of Certain Crimes Against the United States, 1 Stat. 112-15 (1790). States in the early Republic likewise treated "nonviolent crimes such as forgery and horse theft" as "capital offenses." *Medina*, 913 F.3d at 158; *see* Banner, *supra*, at 18 (referring to specific examples of individuals in Georgia who "escaped from jail after being condemned to death" for "forgery" or "horsestealing"). And many American jurisdictions up through the end of the 1700s authorized complete forfeiture of a felon's estate. *See* Beth A. Colgan, *Reviving the Excessive Fines Clause*, 102 Calif. L. Rev. 277, 332 & nn.275-276 (2014) (citing statutes); *see also, e.g.*, 2 *Laws of the State of New York Passed at the Sessions of the Legislature (1785-1788)*, at 664-65 (1886) (1788 N.Y. law) (providing for the death penalty for counterfeiting among other crimes); 9 *The Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature* 302-03 (1821) (1777 Va. Forgery law) (providing that forgers and counterfeiters "shall be deemed and holden guilty of felony, shall forfeit his whole estate, real and personal, shall receive on his bare back, at the publick whipping post, thirty nine lashes, and shall serve on board some armed vessel in the service of this commonwealth, without wages, for a term not exceeding seven years"); *A Digest of the Laws of Maryland* 255-56 (1799) (collecting Maryland forgery laws enacted between 1776 and 1778, each of which provided that those convicted "shall suffer death as a felon, without benefit of clergy"); *see generally Medina*, 913 F.3d at 158 ("[I]t is difficult to conclude that the public, in 1791, would have understood someone facing death and estate forfeiture to be within the scope of those entitled to possess arms.").

Both sets of historical traditions demonstrate Section 922(g)(1)'s constitutionality. The historical record shows that legislatures historically disqualified categories of persons from possessing firearms, just as felon-dispossession statutes do today. History shows that legislatures' reasons for doing so could include a legislative judgment that the disarmed persons could not be counted upon to be responsible, law-abiding members of the polity, just as felon-dispossession statutes do today. And history demonstrates that people who committed felonies at the time of the founding would have been exposed to far more severe consequences than disarmament including capital punishment and estate forfeiture.

        c.        **The Indictment Does Not Charge Multiplicitous County**

In the Defense Motion, Defendant Cole argues that there are two sets of multiplicitous counts in the Indictment: Set One refers to Counts 2, 3, and 4 of the Indictment, which pertain to the machine gun seized from Defendant Cole's truck on November 18, 2023. Set Two refers to Counts 7, 8, and 9 of the Indictment, which pertain to the firearm silencers seized from Defendant Cole's premises during the execution of the search warrant.

Multiplicity refers to multiple counts of an indictment which cover the same criminal behavior. *United States v. Frierson*, 698 F.3d 1267 (10th Cir. 2012). Multiplicity is not fatal to an indictment, and the government may submit multiplicitous charges to the jury. Multiplicitous sentences, however, violate the Double Jeopardy Clause of the Fifth Amendment. If a defendant is convicted of two multiplicitous charges, the district court must vacate one of the convictions. A defendant may not be punished for the same conduct under two distinct statutory provisions unless each provision requires proof of a fact which the other does not. *United States v. Etenyi*, 720 Fed.Appx. 445 (10th Cir. 2017).

Under *Blockburger v. United States*, 294 U.S. 299 (1932), multiple convictions do not violate double jeopardy if each offense requires proof of an element not contained in the other.

*See also*, *United States v. Mier-Garces*, 967 F.3d 1003 (10th Cir. 2020). A decision of whether to require the prosecution to elect between multiplicitous counts before trial is within the discretion of the trial court. *United States v. Johnson*, 130 F.3d 1420 (10th Cir. 1997). In the Defense Motion, Defendant Cole argues that the three counts in each set "cover the same criminal behavior," and are therefore multiplicitous. Defendant Cole asks the Court to "order the government to elect which could should go to trial within the two sets of multiplicitous counts." Defense Motion at 9. Since the counts in both sets are not multiplicitous, the Defense Motion should be denied.

Under *Blockburger* and its progeny, the appropriate analysis regarding multiplicity is a comparison of the elements of each count. In this case, all the counts in each respective set requires proof of unique elements. For example, while the charges in Counts 2, 3, and 4 of the Indictment pertain to Defendant Cole's possession of a machine gun in his truck, each count requires proof of an element that the others do not. Count 2 requires proof that the Glock pistol had been modified to shoot more than one round of ammunition without manual reloading by a single function of the trigger, whereas Counts 2 and 3 require proof that Defendant Cole knowingly possessed the machine gun pistol after being a convicted felon (Count 2) and that the machine gun was possessed during and in relation to a drug trafficking crime (Count 3). Similarly, with respect to the second set of counts, Count 7 charges Defendant Cole with unlawfully possessing eight separate firearms after being convicted of a felony, whereas Count 8 requires proof that the firearm silencers were not registered in the National Firearms Registration and Transfer Record ("NFRT"), and Count 9 requires proof that the firearm silencers were used and carried during and in relation to a drug trafficking crime. While the counts in both sets cover similar criminal behavior, a jury could convict Defendant Cole on one of these counts and acquit him of the others. *United States v. Martin*, 2020 U.S. Dist. LEXIS 222833 quoting *United States v. Redbird*, No. CR-19-0347-F at

5 (W.D.Okla. May 22, 2020). As such, none of these counts are multiplicitous, and the Defense Motion should be denied.

## III. CONCLUSION

The United States respectfully requests this Court to deny Defendant's Motion to Dismiss except as it relates to Count 9 of the Indictment.

Respectfully submitted,

CHRISTOPHER J. WILSON
United States Attorney

s/   Michael E. Robinson_____
MICHAEL E. ROBINSON MA BA # 693574
Assistant United States Attorney
520 Denison Avenue
Muskogee, Oklahoma 74401
Telephone: (918) 684-5100
Michael.Robinson3@usdoj.gov

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 13, 2025, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing. Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

Rhyder Jolliff, Barbara Woltz, Brian Deer & James Sicking, Attorneys for Defendant Cole

Dan Medlock, Attorney for Defendant Chesser

s/   Michael E. Robinson
MICHAEL E. ROBINSON
Assistant United States Attorney